Approved: _____   ORIGINAL
　　　　　Eli J. Mark/Daniel C. Richenthal
　　　　　Assistant United States Attorneys
　　　　　Alona Katz
　　　　　Special Assistant United States Attorney

Before:　　THE HONORABLE KEVIN NATHANIEL FOX
　　　　　United States Magistrate Judge
　　　　　Southern District of New York　　**19 MAG 9341**

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA　　　　　　:　**SEALED COMPLAINT**

　　　　　- v. -　　　　　　　　　　:　Violations of
　　　　　　　　　　　　　　　　　　　18 U.S.C. §§ 371,
SYLVIA ASH,　　　　　　　　　　　　:　1512(c), 1519, and 2

　　　　　　Defendant.　　　　　　:　COUNTY OF OFFENSE:
　　　　　　　　　　　　　　　　　　　NEW YORK

- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

　　　　LAVALE JACKSON, being duly sworn, deposes and says that he
is a Special Agent with the United States Attorney's Office for
the Southern District of New York ("USAO-SDNY"), and charges as
follows:

COUNT ONE
(Conspiracy to Obstruct Justice)

　　　　1.　　From at least in or about January 2018, up to and
including at least in or about July 2018, in the Southern
District of New York and elsewhere, SYLVIA ASH, the defendant,
and others known and unknown, willfully and knowingly did
combine, conspire, confederate, and agree together and with each
other to commit offenses against the United States, to wit,
obstruction of justice, in violation of Title 18, United States
Code, Sections 1519 and 1512(c).

　　　　2.　　It was a part and object of the conspiracy that
SYLVIA ASH, the defendant, would and did knowingly alter,
destroy, mutilate, conceal, cover up, falsify, and make a false
entry in a record, document, and tangible object with the intent
to impede, obstruct, and influence the investigation and proper
administration of a matter within the jurisdiction of a
department and agency of the United States and in relation to

and contemplation of such a matter and case, to wit, ASH agreed with others to sign a false and misleading document in an attempt to impede, obstruct, and influence a federal investigation of the former Chief Executive Officer ("CEO") of Municipal Credit Union (the "Credit Union"), in violation of Title 18, United States Code, Section 1519.

3.    It was a further part and object of the conspiracy that SYLVIA ASH, the defendant, would and did corruptly alter, destroy, mutilate, and conceal a record, document, and other object and attempt to do so, with the intent to impair the object's integrity and availability for use in an official proceeding, and otherwise would and did obstruct, influence, and impede an official proceeding, and attempt to do so, to wit, ASH agreed with others to obstruct, influence, and impede a federal investigation of the former CEO and others of the Credit Union, in violation of Title 18, United States Code, Section 1512(c), and sought to carry it out, by among other things, (i) concealing and deleting text messages and email messages and wiping her Apple iPhone to seek to destroy and impair the availability of evidence that had been sought from her by federal grand jury subpoenas, and (ii) making false and misleading statements to federal law enforcement officers.

### Overt Act

4.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt act, among others, was committed in the Southern District of New York:

a.    In or about January 2018, SYLVIA ASH, the defendant, signed a false and misleading memorandum regarding millions of dollars that the CEO obtained from the Credit Union.

(Title 18, United States Code, Section 371.)

### COUNT TWO
(Obstruction of Justice)

5.    In or about January 2018, in the Southern District of New York and elsewhere, SYLVIA ASH, the defendant, knowingly altered, destroyed, mutilated, concealed, covered up, falsified, and made a false entry in a record, document, and tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States and in relation to and contemplation of such a

2

matter and case, to wit, ASH signed a false and misleading memorandum regarding millions of dollars that the CEO obtained from the Credit Union, in an attempt to obstruct and influence a federal investigation of the CEO.

(Title 18, United States Code, Sections 1519 and 2.)

COUNT THREE
(Obstruction of Justice)

6.    From at least in or about January 2018, up to and including at least in or about July 2018, in the Southern District of New York and elsewhere, SYLVIA ASH, the defendant, corruptly altered, destroyed, mutilated, and concealed a record, document, and other object, and attempted to do so, with the intent to impair the object's integrity and availability for use in an official proceeding, and otherwise obstructed, influenced, and impeded an official proceeding, and attempted to do so, to wit, ASH (i) concealed and deleted text messages and email messages and wiped her Apple iPhone to seek to destroy and impair the availability of evidence that had been sought from her by federal grand jury subpoenas, and (ii) made false and misleading statements to federal law enforcement officers in connection with a federal investigation of the CEO and others.

(Title 18, United States Code, Sections 1512(c) and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

7.    I am a Special Agent with the USAO-SDNY and have been in that position for approximately five years.  For over the past year, I have been personally involved in the investigation of this matter, along with other Special Agents of the USAO-SDNY, and with the assistance of the New York State Department of Financial Services ("NYS-DFS") and the New York County District Attorney's Office.  Previously, I was a Special Agent with the U.S. Department of Labor-Office of Inspector General ("DOL-OIG") for over nine years.  While with the USAO-SDNY and DOL-OIG, I have participated in multiple investigations of corruption and fraud offenses, including those involving non-profit institutions.

8.    I am familiar with the facts and circumstances set forth below from my participation in the investigation of this matter, from my personal knowledge, from my conversations with other law enforcement agents and personnel, and witnesses, and my examination of various reports and records.  Because this

3

affidavit is being submitted for the limited purpose of
demonstrating probable cause, it does not include all the facts
that I have learned during the course of my investigation.   In
addition, this investigation is ongoing, and the monetary
calculations are based on the records obtained to date and are
approximates, unless otherwise noted.   Where the contents of
documents and the actions, statements, and conversations of
others are reported herein, they are reported in substance and
in part, except where otherwise indicated.

### Overview

9.     The charges in this Complaint result from the
attempted cover-up of a scheme involving corruption and fraud at
Municipal Credit Union, a multi-billion dollar non-profit and
the oldest credit union in New York State.   Since in or about
2017, the USAO-SDNY has been investigating wrongdoing that has
harmed the Credit Union and its members, including that
committed by or with the knowledge of certain members at the
highest echelons of the organization, and an attempted cover-up
of this wrongdoing.

10.   As described in greater detail below, this
ongoing investigation has revealed that SYLVIA ASH, the
defendant, a New York State Supreme Court Justice and former
Chair of Municipal Credit Union's Board of Directors, agreed and
attempted to obstruct and seek to influence the federal criminal
investigation into the massive fraud and embezzlement scheme
committed by Kam Wong, Municipal Credit Union's former CEO and
President.   Among other things, ASH (1) with the agreement and
assistance of others, signed a false and misleading memorandum
regarding millions of dollars Wong obtained from Municipal
Credit Union, which Wong then supplied to a federal agent,
(2) deleted text messages and email messages and wiped her Apple
iPhone to seek to destroy and conceal evidence that had been
sought from her by federal grand jury subpoenas, and (3) made
false and misleading statements to federal investigators about
the same.

4

## Relevant People and Entities

11.   I have learned the following based on my interviews of current and former employees of the Credit Union, my review of records obtained from the Credit Union, the New York State Office of Court Administration, and other entities, and my review of publicly-available information:

a.   Municipal Credit Union (sometimes referred to as "MCU," and generally referred to herein as the "Credit Union"), with headquarters in downtown Manhattan, is the oldest credit union in New York State and one of the oldest and largest in the country.  The Credit Union is regulated and supervised by NYS-DFS and the National Credit Union Administration ("NCUA"), the latter of which is a federal agency that insures deposits at credit unions.

b.   The Credit Union is a not-for-profit financial institution that is cooperatively owned by its customers, who are known as "members."  The Credit Union, in contrast to for-profit financial institutions, is designed to focus on serving members, rather than on making a profit for shareholders.  As a result, the Credit Union's earnings are intended to go back to members in the form of more favorable rates and fewer and lower fees for products and services.

c.   The Credit Union presently provides banking services to more than 500,000 members, and has more than $2.9 billion in member accounts, each of which is federally insured up to $250,000 by the National Credit Union Share Insurance Fund, which is administered by the NCUA.  Membership in the Credit Union is generally available to employees of New York City and its agencies, employees of the federal and New York state governments who work in New York City, employees of hospitals, nursing homes, and similar facilities located within New York State, and others who are eligible as specified in the Credit Union's bylaws.

d.   At all times relevant to this Complaint, the Credit Union was supposed to be overseen by a Board of Directors (the "Board") and a Supervisory Committee (the "Supervisory

Committee"), each of which was composed of volunteer, uncompensated members of the Credit Union.[1]

      e.    SYLVIA ASH, the defendant, is a New York State Supreme Court Justice in Kings County. ASH has served as judge in the New York state court system since at least approximately 2006, first as a Kings County Civil Court judge, and, commencing in 2011, as a Kings County Supreme Court Justice. In or about January 2016, ASH was appointed to be the presiding judge in the Kings County Supreme Court's Commercial Division.

      f.    ASH served on the Credit Union's Board from in or about May 2008 until on or about August 15, 2016, when she resigned. ASH also served as a trustee of the Credit Union's pension plan, a position from which she resigned on or about October 31, 2016. From in or about May 2015 until her resignation from the Board, ASH served as the Chair of the Board. Prior to her resignation, according to information provided by the New York State Office of Court Administration, ASH had presided over, or issued an order or opinion in, multiple cases in both the Civil Court and Supreme Court where the Credit Union was a party.[2]

_____

[1]    Based on my review of documents, I have learned that, on or about May 24, 2018, NYS-DFS issued an order removing the members of the Supervisory Committee, and on or about June 22, 2018, NYS-DFS issued an order removing the members of the Board as a result of significant concerns regarding the Board's oversight of the Credit Union's operations.

[2]    Based on my review of documents obtained by subpoena, I have learned that ASH resigned from the Board after the New York State Commission on Judicial Conduct (the "Judicial Commission") filed a complaint against her for serving on the Board notwithstanding that the Credit Union was regularly engaged in adversary proceedings in the courts of New York, in violation of rules governing a judge's extra-judicial activities. I have further learned that, in or about May 2015, prior to becoming the Chair of the Board, ASH sought advice from the New York State Advisory Committee on Judicial Ethics (the "Committee") as to whether she could serve as the Chair of the Board, and after being told that she could not, she informed the Committee that she would resign from the Board. ASH, however, did not resign until more than a year later, after the Judicial Commission filed the complaint against her.

g.      From on or about at least 2007 until on or
about June 12, 2018, Kam Wong served as the Credit Union's CEO
and President.  On or about May 8, 2018, Wong was charged and
arrested by the USAO-SDNY, and, on or about June 12, 2018, Wong
was terminated by the Credit Union.  On or about December 2,
2018, Wong pled guilty to embezzlement from the Credit Union,
and acknowledged, in his written plea agreement, endeavoring to
obstruct and impede and obstructing and impeding the
administration of justice with respect to the criminal
investigation into this matter, and agreeing with one or more
others to do the same.

## ASH's Receipt of Benefits and Gifts from the Credit Union and Her Failure to Disclose the Same on Annual Judicial Financial Disclosure Forms

12.      Based on my review of records obtained from the
Credit Union, and interviews of Credit Union employees, I have
learned the following:

a.      Although the Credit Union's Board positions
are volunteer and ostensibly unpaid positions, at all relevant
times to this Complaint, multiple Board members regularly
incurred significant expenses each year paid by the Credit Union
for, among other things, conferences at foreign destinations,
food, and donations to charitable organizations of their choice.

b.      From at least in or about 2012 through 2016,
SYLVIA ASH, the defendant, received annually tens of thousands
of dollars in reimbursements and other benefits from the Credit
Union, including airfare, hotels, food and entertainment
expenses for her and a guest to attend conferences domestically
and abroad, as well as payment for phone and cable bills, and
electronic devices.  For example, in 2015, the Credit Union
spent approximately $63,408 for the benefit of or at the
direction of ASH, the most of any Board director that year.
These expenses included, among other things, Apple devices,
airfare, and hotels for multiple conferences for her and a guest
(including in Cancun, San Juan, and the Greek Isles), tickets to
sporting events, and use of the Credit Union's suite at MCU Park
(a minor league baseball stadium) for a party, along with food
and alcohol expenses.

c.      Even after her resignation from the Board,
ASH continued to receive benefits, such as trips and Apple
devices, from Kam Wong (who generally obtained such items from
or charged them to the Credit Union) and/or the Credit Union.
The Credit Union spent approximately $4,284 for the benefit of

7

ASH in 2017, which, as noted above, was after her tenure at the Credit Union was completed. These expenses included, among other things:

            i.      In October 2016, ASH attended a Credit Union conference in Las Vegas, Nevada, with a guest, for which the Credit Union paid the hotel, airfare, food, and entertainment expenses, including three tickets to a Britney Spears concert at Planet Hollywood, totaling more than $3,800. In June 2017, ASH was a guest of another Credit Union Board member in Cuba at the Caribbean Confederation of Credit Unions Conference, and her expenses for this trip were also paid for by the Credit Union.

            ii.     On or about August 5, 2017, ASH used the Credit Union's suite at MCU Park, during which she spent approximately $1,741 in food and alcohol (including a personalized cake), management fees, and gratuities, paid for by the Credit Union.

       13.  Based on my review of records obtained from the New York State Office of Court Administration, I have learned the following:

            a.      All New York State judges are required to file annual financial disclosure forms that identify, among other things, any directorship held by the reporting individual, whether compensated or not; any gifts, in excess of $1,000, received during the reporting period; and any reimbursements for expenditures, in excess of $1,000, received during the reporting period. The financial disclosure forms are available to public inspection upon request.

            b.      For each year between 2012 (which is the earliest year for which I understand the court system still keeps records) and 2018, inclusive, SYLVIA ASH, the defendant, filed an annual financial disclosure statement. In each form she filed, ASH did not disclose any directorships held, and she did not disclose any expenses or gifts received, including from the Credit Union.

ASH's Agreement and Effort to Cover-Up Kam Wong's Crimes: The
False and Misleading Memorandum

        14.   The ongoing investigation has revealed that,
after SYLVIA ASH, the defendant, learned of the federal
investigation into Kam Wong, she agreed and attempted to protect
Wong, including by signing a false and misleading memorandum
about millions of dollars that Wong had received from the Credit
Union, as set forth in greater detail below.

        15.   On or about January 17, 2018, I and another law
enforcement agent went to Kam Wong's residence in Long Island in
an attempt to interview Wong for the first time in connection
with the federal investigation of him.  Wong was not home at the
time, and I left my business card with Wong's spouse.  Based on
my review of phone records, I have learned that, later that same
evening, at approximately 7:50 p.m., Wong used his Credit Union
cellphone (the "Wong Cellphone") to call a cellphone registered
to SYLVIA ASH, the defendant (the "Ash Cellphone"), which
appears to have gone to voicemail.[3]

        16.   Based on my review of phone records for the Wong
Cellphone and the Ash Cellphone, I have further learned that, on
or about January 18, 2018, the next morning, before Kam Wong was
first interviewed by me and another law enforcement agent (and
made false statements to us about money he had embezzled from
the Credit Union), Wong and SYLVIA ASH, the defendant, exchanged
three calls of short duration (approximately 44 seconds, 5
seconds, and 21 seconds, respectively).  Then, at approximately
1:15 p.m., also before my first interview of Wong, ASH called
Wong, and the call lasted more than 3 minutes.[4]

        17.   On the afternoon of the same day, January 18,
2018, I conducted the first of multiple interviews of Kam Wong,
during which, after I identified myself, he made false and
misleading statements in response to questions concerning

_____

[3]     I know that both Wong and ASH used these respective
cellphone numbers at relevant times because I have spoken to
each of them by calling the pertinent phone numbers.

[4]     Based on my review of emails obtained by subpoena from a
New York-based charitable organization for which SYLVIA ASH, the
defendant, serves as a director, I know that, approximately 1.5
hours later, ASH emailed other members of the organization to
inform them that the Credit Union had committed to donate
$25,000 toward an organization event.

9

hundreds of checks he had received from the Credit Union.    In
particular, Wong lied about money he had embezzled from the
Credit Union -- for which he later pled guilty -- such as
purported Long Term Disability ("LTD") insurance offset payments
("LTD offset payments"), to which he falsely claimed he was
entitled under his employment contact.    In addition, he falsely
claimed that the Board had approved the LTD offset payments.
Wong also provided a purported "model" for the LTD offset
payments he had received, which he claimed sought to justify or
explain those payments, but which the investigation later
revealed to have been fraudulently prepared by Wong.

        18.   Based on my interview of an insurance broker
("Broker-1"), I know that shortly after I interviewed Kam Wong
on January 18, 2018, Wong contacted Broker-1 in an apparent
attempt, for the first time, to obtain support for Wong's
"model" regarding insurance payments.   Broker-1 also stated that
Wong had informed him, in sum and substance, that Wong had been
contacted by federal agents from the Treasury Department
(apparently misidentifying me and another law enforcement agent
as being from the Treasury Department instead of USAO-SDNY).

        19.   Based on my review of Kam Wong's text messages
over the Wong Cellphone, I have learned that, later on the
afternoon of same day, January 18, 2018, between approximately
5:41 p.m. and 5:47 p.m., after I first interviewed Wong and he
made false statements, Wong and SYLVIA ASH, the defendant,
exchanged the following text messages:

> | Wong: | Hi Sylvia: I have the silver X that you may like.[5] Do you want to come in to pick it up tomorrow? |
> | --- | --- |
> | ASH: | Definitely yes. Can i pick it up in the morning |
> | Wong: | Ok, just let me know what time. |
> | ASH: | Between 8:30 and 9? |
> | Wong: | Sounds good. I'll see you then. |
> | ASH: | ◄ |

---

[5]   I understand an "X" in this and subsequent conversations to
refer to an Apple iPhone X.

10

20. Based on my review of Kam Wong's text messages, which were obtained from the Wong Cellphone, I have further learned that the following day, January 19, 2018, Wong and SYLVIA ASH, the defendant, exchanged additional text messages. Specifically:

a. Between 9:03 a.m. and 9:05 a.m., Wong and ASH exchanged the following text messages: First, Wong texted ASH, "Hi Sylvia: Are you coming? When you come and if I'm not here, just wait for me." Then, at 9:04 a.m., ASH replied, "Just walking into the building," and at 9:05 a.m., Wong responded, "Oh, ok."

b. Approximately a half hour later, at 9:33 a.m., Wong texted ASH, "Oh, Sylvia: I forgot to tell you the AirPod which is the Apple's Bluetooth wireless earphones are very good!!! I'll get you one because they go really nice and work great with the X." At approximately 10:08 a.m., ASH replied, "You're the Best".

21. Based on my review of records from Apple obtained by a judicially-authorized search warrant and associated with SYLVIA ASH, the defendant, I have learned that ASH had a calendar entry, dated January 19, 2018, with the subject "iPhone X," and the location of "MCU."

22. Based on my review of Kam Wong's text messages, which were obtained from the Wong Cellphone, I have learned that the same morning, January 19, 2018, between 9:35 a.m. and 9:43 a.m., after SYLVIA ASH, the defendant, and Kam Wong, had arranged to meet, Wong exchanged a series of text messages with a then-current Supervisory Committee member ("Member-1"), regarding, in part, Wong's recent meeting with ASH, and ASH's willingness to sign an affidavit memorializing a purported prior conversation Wong and ASH had regarding LTD offset payments. In particular, Wong and Member-1 exchanged the following messages:

Wong:           I had a good conversation with Sylvia

Member-1:       Good.

                .  .  .

                Ok. Hopefully I'll hear from her.
                Today. I'd like to give you some peace
                of mind

11

                    ASAP

Wong:               Hear fro [*sic*] Sylvia?

Member-1:           Yes.  Of Course. She's looking for PBA
                    cards[6]

                    Hahahhaha.

Wong:               Sylvia remembers our conversation.

                    She said if anyone asks for an
                    affidavit for our conversation, she'll
                    sign it.

Member-1:           It's all good Kam.

                    She understands

Wong:               I just said to her that someone is
                    giving me trouble for the LTD insurance
                    offsets.

Member-1:           She and I have a good enough
                    relationship that if you can't talk to
                    her or anyone else.

                    I'll be able to intervene without a
                    problem

Member-1:           [The Credit Union's outside auditors]
                    is also in a good place with this.

Wong:               Ok, that's great.

Member-1:           Thank you for the trust. !

---

[6]    Based on my review of text messages from a cellphone seized
from Member-1's residence, pursuant to a judicially-authorized
search warrant, I know that on or about February 5, 2018, SYLVIA
ASH, the defendant, texted Member-1 a photograph of multiple New
York City Police Benevolent Association ("PBA") cards, and what
appeared to be a parking placard and cards associated with a
certain organization of retired New York City Police Department
officers, for which the placard and cards identified Member-1 as
its vice president.

                              12

23.    In the afternoon of the same day, January 19, 2018, I called Kam Wong at his office in Manhattan to request Wong's complete employment contract (which, as noted above, he had previously claimed entitled him to the LTD offset payments he had received), and the Board meeting minutes approving the contract. At that point, contrary to what he had said the previous day, Wong informed me that the arrangement for him to receive LTD offset payments was not in his contract or in a Board resolution, but that SYLVIA ASH, the defendant, who was the former Chair of the Board, had orally approved the payments. Wong also provided Ash's cellphone number (the "Ash Cellphone Number"), so that I could contact ASH to confirm this information.

24.    Based on my review of Credit Union documents, I know that on or about January 22, 2018, approximately three days later, Kam Wong attended a meeting of a committee of the Board and requested that the committee "retroactively" recommend that the Board approve the LTD Offset Payments, which the committee did recommend. Based on my review of Credit Union records and interviews of former Board members who served on that committee, I believe that, in seeking and obtaining this retroactive recommendation, Wong made false and misleading statements to the committee of the Board, and did not disclose that he had been recently approached by law enforcement regarding the LTD Offset Payments. The Board ultimately did not consider or approve that misleadingly obtained recommendation after the Credit Union subsequently learned of this investigation.

25.    Based on my review of Apple records, I have learned that, on or about January 20, 2018, which, as noted above, was the day after Kam Wong told Member-1 that ASH stated she would sign an affidavit for him, and WONG gave me ASH's contact information and said she had approved the LTD offset payments, SYLVIA ASH, the defendant, registered a silver colored iPhone X (the "iPhone X") to her account with iCloud, a cloud storage and cloud computing service from Apple. Based on the timing of the registration of this new device to ASH's iCloud account, I believe this is the same iPhone X that Wong gave ASH the day before.

26.    Based on my review of Kam Wong's text messages, which were obtained from the Wong Cellphone, I have learned that a few days later, on or about January 24, 2018, Wong texted

SYLVIA ASH, the defendant, "Sylvia: I have the AirPods.  Do you want me to send someone to bring that to you?"[7]

     27.  On or about January 23 and 24, 2018, in Manhattan, Kam Wong provided me with two substantively identical documents that appeared to have been signed separately by the Credit Union's then-current Treasurer and Supervisory Committee Chair; and on or about the following day, Wong provided me in Manhattan with a third substantively identical document that appeared to have been signed by SYLVIA ASH, the defendant (the "January Memorandum").  The January Memorandum was dated January 22, 2018, had the subject "Long Term Disability Insurance for the CEO," and was addressed from Wong to ASH.  The January Memorandum recounted a supposed June 2015 meeting during which ASH purportedly agreed to the payout to Wong of "approximately $3.7 million (net of applicable taxes)" in order to cancel and void a provision in Wong's employment contract that provided Wong with LTD insurance coverage.  The January Memorandum requested that the recipient (ASH) sign the memorandum if the memorandum was "accurate" and that ASH had "agreed" with the "payout approach" detailed in the memorandum.[8]

     28.  Based on my review of text messages from a cellphone issued by the Credit Union to Member-1 and recovered during a judicially-authorized search of Member-1's residence (the "Member-1 Cellphone"), I have learned that between January 25, 2018 -- the date Kam Wong provided me with the January Memorandum that appeared to have been signed by SYLVIA ASH, the defendant -- and May 16, 2018, Member-1 and ASH exchanged more than 250 text messages, including numerous messages about Wong, the Credit Union's internal investigation, and the federal criminal investigation, including:

     a.  On January 25, 2018, Member-1 texted ASH: "Gentle reminder I'm on the Pba cards I was just waiting for

---

[7]    Based on my review of Apple's website, I know that AirPods are a wireless headphone compatible with an iPhone X.

[8]    As noted above, in connection with Kam Wong's written plea agreement, Wong admitted to endeavoring to obstruct and impede and obstructing and impeding the administration of justice with respect to the criminal investigation into this matter, and agreeing with one or more others to do the same, including by supplying me with false and misleading documents.

them. As you may have heard big cuts. :-) Thank you for meeting
with Kam."

        b.    On February 22, 2018, Member-1 texted ASH:
"The board just supended [sic] Kam ... Don't call Kams number
they took that phone also." ASH replied, "OMG! That is so
wrong." Later that night, ASH texted, "It seems that they [MCU]
hired the Lawyers to do the Justice Department's job," to which
Member-1 replied, "Exactly."

        c.    On February 23, 2018, ASH texted Member-1,
in part, "With the exception of [a certain Board member] the
Board is very weak and has no Balls. ... They have NO
loyalty." Member-1 replied, "Exactly."

        d.    The same day, ASH texted Member-1, "It's my
opinion that MCU's In-house counsel and the [outside] lawyers
were working together to get information to justify Kam's
removal to get the Justice Dept. to back off their
investigation. They never gave Kam the benefit of the doubt . .
. . They allowed the Justice Dept. to bamboozle them."

                    ASH's First Interview with the USAO-SDNY

        29.   On or about March 1, 2018, I interviewed SYLVIA
ASH, the defendant, at the United States Attorney's Office in
Manhattan, a meeting to which I invited her by calling her on or
about February 21, 2018. During the interview, ASH, stated, in
substance and in part, the following:

        a.    ASH served as the Chair of the Board from
2015 through 2016, and resigned after she was appointed as a
Justice for the Commercial Division because the Credit Union had
foreclosure matters before the court.[9]

        b.    Before she became Chair, the Board voted to
renew Kam Wong's employment contract, although the Board was not
provided with a copy to review prior to the vote.

───────────

[9]    In providing this information, ASH did not disclose that,
as the investigation later revealed, she had been advised to
resign from the Board approximately a year before she did, she
ultimately resigned because an ethics complaint was filed
against her, and she had presided over cases where the Credit
Union had been a party while she served as a judge.

                                15

c.    When ASH became Chair, she was provided with Wong's contract to review for a few minutes prior to a Board meeting, but she did not, and was not permitted to, maintain a copy of it.   There were three copies of Wong's contract, which were maintained by Wong, the Human Resources Department, and the Legal Department.   ASH asked if the Board could receive a copy of Wong's contract to keep, but was told that the Board does not get to keep a copy.

d.    In or about October 2015, ASH participated in a conversation with Wong and others about Wong's contract, which included a discussion of LTD insurance under his contract. During that conversation, Wong stated, in sum, that it was too costly for the Credit Union to obtain LTD insurance for him and it would be cheaper for the Credit Union to pay him directly in lieu of that benefit, *i.e.*, to pay him money rather than purchase insurance for him.   Ash did not recall any discussion of the specific cost (or any monetary figures) for the LTD insurance or for any alternative payments to Wong during this conversation.

e.    ASH did not recall approving the payments Wong proposed.   Rather, she recalled that the Credit Union's then-General Counsel (the "General Counsel") had informed her that Wong had the option under his employment contract to receive money himself in order to obtain LTD insurance instead of having the Credit Union purchase LTD insurance for Wong, although the General Counsel did not consider that approach advisable.

f.    ASH did not review Wong's contract to determine for herself whether Wong's contract entitled him to obtain payments in lieu of an LTD insurance policy, as Wong claimed.

g.    Wong asked ASH to sign the January Memorandum, which he prepared, because, according to Wong, he was being investigated, although Wong was not specific as to the nature of the investigation.

h.    After being presented with the January Memorandum by Wong, ASH reviewed it for about two minutes, and then signed it.

i.    Upon questioning during the interview, ASH acknowledged that the January Memorandum was not an accurate reflection of her recollection of her meeting and discussion with Wong about LTD insurance, any payments to him in lieu of

16

the insurance, and his contract. In particular, contrary to what was in the January Memorandum, ASH had not had a conversation in June 2015 during which she agreed to the payout of "approximately $3.7 million (net of applicable taxes)" from the Credit Union to Wong.

30. Based on my review of text messages from the Member-1 Cellphone, I have learned that, the day after my first interview of SYLVIA ASH, the defendant, on or about March 2, 2018, Member-1 and ASH exchanged text messages concerning meeting up at a funeral event for a recently deceased Board member, and that Member-1 said he would be going with Kam Wong to the event around 3 p.m., to which ASH replied, "I will be there st [sic] 3 tomorrow. Thanks for the heads up. Pursuant to Mission Impossible, these email correspondence will be deleted in 5 minutes😁😁 See you tomorrow."

### ASH's Failure to Comply with the First Grand Jury Subpoena

31. Based on my participation in the investigation, I know that on or about March 13, 2018, SYLVIA ASH, the defendant, was served, via email, with a federal grand jury subpoena (the "First Subpoena") calling for the production of documents related to various matters, including long term disability insurance for Kam Wong, Wong's compensation, and any communications with Wong through the date of the First Subpoena.

32. On or about April 6, 2018, I spoke with SYLVIA ASH, the defendant, over the telephone, from my office in Manhattan, regarding her response to the First Subpoena. During the call, ASH informed me, in sum and substance, that she did not have any responsive records to produce.

33. Approximately two months later, on or about June 8, 2018, I again spoke with SYLVIA ASH, the defendant, over the telephone, regarding her response to the First Subpoena, to which ASH had previously informed me that she had no responsive records. During that second interview, the following occurred, in substance and in part:

a. ASH repeated that she did not have any responsive records to produce.

b. ASH stated that she had lost access to all Credit Union-related correspondence after she had resigned from the Board.

c.     ASH acknowledged that she had continued to communicate with Kam Wong following her departure from the Credit Union but claimed that, aside from inquiring whether she could host her birthday party at a stadium in Brooklyn that the Credit Union sponsored, their conversations did not involve Credit Union business.

d.     ASH stated that she had deleted such personal communications with Wong after she had been served with the First Subpoena because there was, in her view, no need for her to keep such communications.

e.     After being questioned about whether Wong had provided her with an iPhone X, ASH acknowledged that Wong had given her one in approximately January 2018. ASH stated that her prior phone issued from the Credit Union had broken, and she wanted to wait until the iPhone X was released to obtain a replacement from the Credit Union. ASH added she did not know if the iPhone X Wong gave her was from Wong personally or was from the Credit Union.

f.     ASH did not believe Wong had told her, prior to her signing the January Memorandum, that Wong had spoken with federal agents.

g.     ASH stated that Wong had stated to her that an issue had come up about his LTD insurance coverage, which was why he needed a memorandum from her. Wong also told ASH that he was going to have the then-Chair of the Supervisory Committee sign a memorandum as well.

34.     Based on my review of text messages obtained from a device seized from Kam Wong's residence pursuant to a judicially-authorized search warrant, I have learned that in addition to the text messages described above, and contrary to the statements of SYLVIA ASH, the defendant, ASH also texted Wong about the criminal investigation and continued to text him through on or about March 12, 2018, which, as noted above, was the day before ASH received the First Subpoena. Based on my review of these text messages, I have learned that from February 23, 2018, the date of the first text message found on this device and one day after Wong was placed on administrative leave by the Credit Union, through March 12, 2018, the day before ASH was served with the First Subpoena, Wong and ASH exchanged approximately 23 text messages. In particular, on February 23, 2018, ASH and Wong exchanged the following messages, among others:

18

ASH:        Hi Kam, So sorry to hear the sad unbelievable news for which there is clearly no legal justification. . . . I am also praying that this terrible ordeal will soon be over and that you will be right back where you belong, running MCU as it's [*sic*] CEO/President once again.

Wong:     It is totally wrong that the board only listened to [the Credit Union's outside counsel] without giving me a chance to explain or defend myself.

. . .

Wong:     . . . I spoke to [the first name of one of Wong's criminal defense attorneys]. We will fight back!!

ASH:        I spoke to [a current Board member], and like me, she is also a true friend who has your back.

Wong:     I know friends like you, [list of other names] etc..are giving me tremendous support !

Wong:     [The former Board Chair ("Former Chair")] might have an agenda!

ASH:        He is a disappointment.

. . .

[The then-current Board Chair] and [the then-current General Counsel] are also major disappointments. . . .

19

ASH's Failure to Comply with the Second Grand Jury Subpoena and
Destruction of Documents

35.     Based on my participation in the investigation
and my review of documents, I know that on June 18, 2018, SYLVIA
ASH, the defendant, was served, via email, with a second federal
grand jury subpoena (the "Second Subpoena") calling for the
production of, among other things, all correspondence with Kam
Wong and Member-1; all documents regarding any criminal
investigation, internal investigation, or audit related to Wong;
and all documents regarding any items of value received from
Wong, Member-1, or the Credit Union.

36.     Based on my review of Credit Union documents, I
have learned that, the next day, on or about June 19, 2018, the
Credit Union sent to SYLVIA ASH, the defendant, a letter, via
FedEx and email, requesting the return of any electronic devices
that were issued to ASH by the Credit Union, including by Kam
Wong.  The letter also "advised that you do not have MCU's
permission or authority to wipe, delete, reset, factory restore,
image or copy any of MCU's electronic devices," and cited the
Credit Union's policy manual and previous electronics agreements
signed by ASH.[10]

37.     Based on my review of Apple customer service
records obtained by subpoena with respect to SYLVIA ASH, the
defendant, I have learned that on June 21, 2018 (approximately
three days after receiving the Second Subpoena and two days
after receiving the Credit Union's request to return her devices
without wiping or resetting them), ASH phoned Apple support to
seek assistance in erasing the contents of an Apple device and
to schedule an appointment at an Apple Genius Bar, which I
understand to be the part of the store that provides services
like that requested by ASH.  Specifically, she stated, in sum,
that she wished to transfer the contents of an iPhone X to

_____

[10]     Based on my review of Credit Union documents and my
interview of a former Credit Union executive operations manager
("Manager-1"), I have learned that approximately two months
earlier, Manager-1, at the request of the then-acting CEO of the
Credit Union (the "Acting CEO"), requested that ASH return her
MCU-issued devices on or about May 14, 2018.  After ASH
questioned why the Credit Union wanted the devices returned,
Manager-1, upon discussing the matter with the Acting CEO, told
ASH to disregard his request to return the devices "since you've
had the devices for 3 years or more."

another Apple device because she wished to give someone the iPhone X as a "gift." Further, the records reflect that on June 23, 2018, ASH appeared in person at an Apple location. Apple customer service notes from the visit state that the "customer came in with two iPhones [and] would like to set one up with iCloud restore and the second to clear completely. Also unpairing watch."

38. Based on my review of Apple and phone records, I have learned that on or about the same day, June 23, 2018, the Ash Cellphone Number was switched from being associated with the iPhone X to a different Apple device.

39. Based on my participation in the investigation and my review of documents, I have learned that, on July 6, 2018, via retained counsel, SYLVIA ASH, the defendant, produced documents to the USAO-SDNY deemed responsive to the Second Subpoena. Based on my review of the production, I am aware of the following:

a. The production included copies of emails between ASH and members of the Credit Union, including with Kam Wong, that were sent and received at ASH's AOL email account between April 2015 and May 2018. ASH also produced a single email that had been sent and/or received from a Gmail account that I have learned she also used (the "Ash Gmail Account"). Many of these documents appeared to be responsive to the First Subpoena, despite ASH's prior claims that she had no documents that were responsive to the First Subpoena.

b. The production did not contain any text messages. As noted above, based on my review of text messages from certain of Wong's and Member-1's cellphones, I am aware that ASH texted with, at a minimum, Wong and Member-1, and that these texts would have been responsive to the First Subpoena and the Second Subpoena.

40. Based on my participation in the investigation and my review of records and information in and concerning the Ash Gmail Account obtained pursuant to a judicially-authorized search warrant, I have learned the following:

a. The Ash Gmail Account is subscribed to in the name of SYLVIA ASH, the defendant, is associated with the Ash Cellphone Number, and lists as an alternate email account ASH's email account with the New York Courts.

21

b.    Prior to serving the Second Subpoena, the USAO-SDNY requested in writing that Google preserve the Ash Gmail Account (the "First Preservation Request"), which, on or about June 13, 2018, Google did, preserving both the log-in information and content as of that date (the "First Preservation").

c.    The Internet Protocol ("IP") logs for the Ash Gmail Account indicate that the last log-in made to this account before the Second Subpoena was on or about June 5, 2018, and that there were no log-ins to this account again until on or about June 23, 2018, which was a few days after ASH received the Second Subpoena, and approximately the same time as when she contacted Apple regarding wiping her iPhone X.

41.    Based on my review of the content of the Ash Gmail Account, including the First Preservation, and the content as of the date of the search warrant (the "Unpreserved Content"), I have learned that subsequent to the date of the First Preservation and subsequent to the Second Subpoena, which called for, among other things, email messages between SYLVIA ASH, the defendant, and Member-1, all email messages between ASH and Member-1 were deleted from the Ash Gmail Account. Specifically, I have learned that:

a.    The Ash Gmail Account and certain email accounts associated with Member-1 (collectively, the "Member-1 Email Accounts") exchanged approximately more than 30 messages from on or about March 1, 2018 through on or about May 23, 2018 (the "Deleted Member-1 Emails"), which were found in the First Preservation but did not exist in the Unpreserved Content from the Ash Gmail Account.

b.    The Deleted Member-1 Emails included email messages about the federal investigation, the Credit Union's internal investigation, allegations of misconduct against Board members and the General Counsel, and other topics, none of which was produced by ASH in response to either of the federal subpoenas she was sent.

c.    Approximately 98 percent of emails between January 1, 2018 and June 13, 2018 had been deleted subsequent to the Second Subpoena, whereas less than 30 percent of emails from January 1, 2015 through December 31, 2017 had been deleted. For example:

i.    On February 26, 2018, Member-1 sent ASH an email addressed to "my MCU Famiglia" regarding Kam Wong, the

22

internal investigation and the federal investigation. In the email, Member-1 stated, among other things, "Had Kam Wong been given the Counsel he was entitled to at the very beginning, this would have been over. Had [the Credit Union's outside counsel] been a true counsel to all of the volunteers, this would have been over. . . . Had the [Supervisory Committee] been assigned this investigation . . . this would have been over."

ii. On March 1, 2018, ASH emailed Member-1, "FYI: Got a call from the Justice Dept. today. Wants me to come in to 'informally' talk to me."

iii. On April 2, 2018, ASH emailed Member-1, "Even though you may be the Lone Ranger in this nightmare fiasco, on behalf of the Membership you have to remain vigilant and not give up. I am proud of you!!!"

iv. On April 13, 2018, Member-1 forwarded to ASH an email chain from NYS-DFS regarding a planned meeting with the Supervisory Committee, and wrote to ASH, "[p]lease call."[11]

### ASH's Second Interview with the USAO-SDNY

42. On July 9, 2018, at the USAO-SDNY's offices in Manhattan, in the presence of her counsel, SYLVIA ASH, the defendant, was interviewed regarding Credit Union-issued Apple devices she had received from Kam Wong, and her production of materials to the USAO-SDNY, among other things. During this interview, ASH provided the following information, in substance and in part:

a. ASH repeated her earlier claim that she resigned from the Board because she was elevated to be the presiding judge of the Commercial Division. ASH further stated that because the Credit Union had foreclosure matters before the courts, the New York State Office of Court Administration had advised her to step down.

b. ASH recalled travelling to the Credit Union to receive the iPhone X from Wong in his office. After receiving the iPhone X, Wong asked her to sign the January

---

[11] Based on my review of phone records, I have learned that later that day, April 13, 2018, after this email, the Ash Cellphone Number and the Member-1 Cellphone participated in at least one call that lasted more than 12 minutes.

23

Memorandum.  A week or two after she signed the January
Memorandum, Wong asked if she could sign another copy of the
January Memorandum, to which ASH agreed and did.

              c.  Following Wong's removal from the Credit
Union, bur prior to his arrest, ASH sent Wong uplifting text
messages to keep his spirits up and also discussed what defense
attorney Wong might retain.

              d.  Upon questioning, ASH admitted also texting
with Wong about the General Counsel and the Former Chair,
although she stated she did not recall the details of these
communication(s).

              e.  ASH stopped using the iPhone X subsequent to
Wong's arrest and deleted all her text messages with Wong.  ASH
now uses an iPhone 6 Plus.  In preparation of returning the
iPhone X to the Credit Union, she traveled to an Apple store and
had the phone reset.  She did not recall exactly when that
happened.  ASH, however, had not yet returned the iPhone X
because she received an email from Manager-1 on behalf of the
Acting CEO saying that the Credit Union was no longer seeking to
retrieve any devices.

              f.  During her tenure at the Credit Union, ASH
forwarded or copied certain Credit Union emails to a personal
email account (although she did not specify which one) so that
she could access and read them while at work.

              g.  The documents her counsel produced to the
USAO-SDNY in response to the Second Subpoena were a mixture of
hard copy emails and emails from her email account (although she
did not specify which one).

              h.  After she resigned, ASH took a trip with her
aunt to Las Vegas for a Credit Union event, which was paid for
by the Credit Union.  ASH took this trip, notwithstanding that
she had resigned, because all of her travel arrangements were
paid for by the Credit Union before she resigned.

              i.  After she became Chair, she discussed with
the General Counsel Wong's interest in receiving monetary
payments in lieu of the LTD insurance policy, and the General
Counsel advised that it was permissible for Wong to do so, but
the General Counsel advised against it.

43.   Based on my review of a memorandum of a
subsequent interview of the General Counsel, and conversations
with a law enforcement officer who participated in that
interview, I have learned that SYLVIA ASH, the defendant, did
not discuss with the General Counsel that Kam Wong was
considering receiving payments in lieu of obtaining an LTD
insurance policy nor did the General Counsel tell ASH that it
was permissible but not advisable for Wong to receive such
payments, as ASH claimed.

44.   Based on my review of Credit Union records and
credit card records, I have learned that SYLVIA ASH, the
defendant, purchased her flights to Las Vegas for the Credit
Union event, referenced above, *after* she had resigned, not
before as she claimed, and did so using a personal credit card.
I have also learned that, in her expense report seeking
reimbursement from the Credit Union for those tickets, she
backdated the date of the flight expenses.  Specifically, these
records reveal that:

a.   On or about August 15, 2016, ASH informed
the Credit Union that she had resigned as the Chair of the
Board.

b.   On or about August 24, 2016, ASH, using a
personal credit card, purchased roundtrip flights to Las Vegas
for her and another person, totaling more than $1,360 per
person.

c.   ASH thereafter submitted an expense report,
on or about August 31, 2016, to the Credit Union for
reimbursement of an alleged August 1, 2016 expense of $2,736.40
for airfare for herself and a guest to the event in Las Vegas.
As noted above, August 1, 2016 was prior to ASH's resignation,
but the tickets were purchased after that date and after her
resignation.

d.   ASH also submitted another expense report,
on or about November 15, 2016, after the Las Vegas trip, for
reimbursement of more than $1,100 in expenses for taxis, meals,
and concert tickets, including to a Britney Spears show, for her
and her guest while in Las Vegas.

45.   Based on my review of Credit Union records, I
know that on July 13, 2018, the Credit Union sent SYLVIA ASH,
the defendant, another letter requesting her to return any and
all Credit Union-issued devices still in her possession, and
again cautioning her that she did not have the Credit Union's

permission or authority to wipe, delete, reset, factory restore,
image, or copy any data saved within the devices.  Approximately
four days later, ASH returned to the Credit Union the iPhone X
and an Apple watch (the "Apple Watch") via a courier service.
Contrary to ASH's statements on July 9, 2018, and contrary to
what the investigation has since revealed, a letter to the
Credit Union from her counsel enclosing the devices stated that
ASH "has not wiped, deleted, reset, factory restored, imaged or
copied any of MCU's electronic devices."

       46.  On or about November 9, 2018, I took possession
of the iPhone X and the Apple Watch from a cyber security
services firm retained by the Credit Union, and I delivered them
to the New York County District Attorney's device analysis
laboratory.  The laboratory subsequently informed me that the
iPhone X had been reset (*i.e.*, wiped), and that, accordingly,
content on the phone, including any previously stored text
messages or emails, could not be retrieved.

       WHEREFORE, the deponent respectfully requests that a
warrant be issued for the arrest of SYLVIA ASH, the defendant,
and that she be imprisoned or bailed, as the case may be.

LaVale Jackson
Special Agent
United States Attorney's Office
Southern District of New York

Sworn to before me this
4th day of October 2019

THE HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK